Good morning. I'm Amitai Schwartz. I'm appearing on behalf of the appellant Grady Arnold. I'd like to reserve three minutes for rebuttal, if possible. Thank you. I want to address three issues. The first is the whether the no comment comment that Mr. Arnold made was an unequivocal assertion of the Fifth Amendment privilege. Second, what the legal consequences of that assertion were. And finally, the issue of prejudice under the habeas corpus standard. The state court, the state appellate court and the state trial court, and indeed the district court, misinterpreted the comment. The when Grady Arnold was asked by the police officer after an off the record discussion whether he would submit to the tape recording and the police officer turned on the tape recording and Mr. Arnold said repeatedly no comment to every question. Before he said no comment, didn't he say something else? Didn't he say he didn't want to make any statement on record? Yes. OK. You didn't mention that. And that's important, I think. Well, the fact of the matter is that that Arnold was given read his Miranda rights. He was told that if he said anything, it could be used against him and so forth. He talked first. He did talk. And then it came. Can we tape you? Right. That's correct. But under Miranda versus Arizona, Michigan versus Mosley, Edwards and so forth, the law is that a person in custody has the right to cut off questioning at any time. And let me get back to a judge price question. When Arnold said, no, I don't want to talk on tape or something like that. You think that itself is an invocation, reinvocation of the Miranda right? I don't know that they I don't know that when he said I don't want to talk on tape necessarily meant that he was asserting the Fifth Amendment privilege at that point. But I think it became clear immediately when when the sergeant asked him the first question and he said no comment. Now, wait a minute. Let me see. I'm looking at the actual part of the record said this is the officer talking that tape recorder. I pull it out and told me one to obtain a tape statement from question. Is that when we had a problem continuing talking with you? Yes. What do you say? He didn't want to talk on tape question. Was he specific? He didn't want to talk on tape. Answer. Yes. Did he other than that refuse to talk to you? Answer no. Correct. But so you're saying that that is not an invocation that he didn't want to be questioned further on tape. Well, he said, oh, it's very clear he didn't want to be questioned on tape. The question is whether it's an invocation of Miranda. And I don't think that the court has to answer that question because the next as soon as he turns the tape the tape recorder on, Arnold makes it crystal clear that he doesn't want he doesn't want to answer. And he says it by saying no comment, which is a. OK, but the questions that the officers asked him after he says he doesn't want to talk on tape, then the officers say they don't. The officers ask him whether he had changed his mind about making a statement or whether he wanted to give a statement or not. And his responses are no comment, no comment. Now, can't you answer yes or no to that? Yes or no. It seems to me is clear. No comment is not. It could be argued to be ambiguous. No, I don't think it's ambiguous at all with with all due respect. The the and the reason is because the law is not that a individual has to say I invoke the Fifth Amendment. No, they don't. I agree with you. So when when Arnold says repeatedly no comment, no comment, no comment, and then the officer, in fact, at the end says, does that mean that every question I'm going to ask you, you're going to say no comment to? And he says no comment. Well, the officer then turns off the tape recorder. The officer got the message. The officer the officer got it right. I mean, this is one of these cases where where the defendant invokes his right to a Fifth Amendment silence by saying no comment. The officer tries. He asks him a number of asks him for a while. And then he he does exactly what he's supposed to do. I don't think you understand, Miranda. I really don't. And I think when the law, Miranda, as I understand it, is if the defendant says I don't want to talk anymore, the officer is not to proceed. Isn't that what Miranda says? That's correct. All right. But you're but what you've said, it leads to an opposite conclusion, conclusion that he didn't invoke his Miranda rights by saying I don't want to talk on tape. He said maybe I'm being misunderstood, and perhaps I could I could be I could try to be more articulate. Most understand. Well, the court found it to be ambiguous. Right. The court did. So and on habeas, you have we have to look to whether that's an unreasonable application. Right. Correct. OK. Of course, I guess the clearest way to be not ambiguous is to say I re-invoke my rights under Miranda. But you don't do that. They don't ever say what he did. But he didn't want to talk. But he didn't say that he did. No, I don't want to talk on tape. And he didn't say one step below that. I refuse to make any statements or, you know, I don't want to make any further statements. So I guess no comment is a next step down. It could have been, which means he doesn't have any substantive comment on that particular question. Or it could mean I'm invoking my right to silence. Isn't it ambiguous in that sense? No, I don't. I don't think it is ambiguous because by saying he did what what, you know, people do in real life, which is if I'm asked a question and I don't want to answer it, I say, I can say, you know, get out of here. I can be cruel about it. Or I can say no comment. Let me ask you this. If we can't agree on it, does that make it ambiguous? You know, if you get three people that said it might mean this, it might mean that or whatever, does it necessarily follow that it's ambiguous? Ultimately it's a legal question and ultimately the court is going to make the legal call. Okay. We have in the record what that says. Let me just quickly ask you. I know we're getting into, you know, but like I said, the ten minutes is our time, but I'll still give you a little time for rebuttal. Let's assume error. All right. Address. Okay. The standard is different whether it does it make a difference whether, you know, what type of error it is. But do the error analysis in terms of it seems to me that this was a very strong evidentiary case. Well, again, I would respectfully disagree. The case was not strong in the sense that there was an alibi defense. Okay. But you've got two guys that do a robbery, right? There were two guys. Two guys that do a robbery. Your client's not identified, right? But there's also a gun that gets shot off during the robbery, correct? Correct. And your guy's fingerprint is on the window where the victim says that the second robber was. Except that one of the witnesses said that they saw the other guy's fingerprint. Well, I know, but I'm just saying, but that's true, that you've got the fingerprint there. That's not disputed, right? Not disputed. And he gets stopped later that evening in a car that has the gun that ballistically matches up to the robbery, right? Correct. And does his co-defendant turn on him? No. The co-defendant, in fact, supports him because the co-defendant was also in the car, the guy Williams. So the gun could have very well been. No, no, no, no.  Yes. All right. And had he given a statement to the police originally that implicated your client? Originally, he said he. And then he backs up when he goes to trial. He said it was some other guy. Okay. So he gets impeached with his prior statement. But all the gun tells you or all the gun casings tell you is that the co-defendant was certainly there. It doesn't necessarily. It doesn't tell you who. Tell you that. Well, does the fingerprint tell us that your client was there? Excuse me? Does the fingerprint tell us your client was there? The fingerprint tells us that our client was there at the. Was there. At some time. Doesn't say he was there at the robbery, but says he was there. And the whole issue is when, because that's what the alibi witnesses were about. There were the two witnesses, the two ladies, who testified that. Does your client say before all this Miranda stuff comes up that he never was there? Yes. Okay. Right. He did. So he's got a little problem because he told the police he was never there. And then he doesn't testify at trial, but he presents witnesses that say, oh, yeah, we remember he did go there to get cigarettes or something. Well, there are three alibi witnesses. There's Williams and the two ladies. There's Wynn, and then there's Andrea Perry. So it's not an overwhelming case. And furthermore, for whatever reason. Well, that's what we have to decide, right, if we find it to be error. I understand. Okay. I'm going to give you, I'll give you two minutes for rebuttal. Okay. Thank you. Thanks. Thank you. Good morning, Your Honor. Morris Bates from the California Attorney General's Office on behalf of the appellant. Let me get to the issue of whether the state was objectively unreasonable in its ruling. The court concluded, the state court did, that there was no, that the words no comment did not clearly, unequivocally, and unambiguously assert the Miranda right to silence. What about the prior statement? Which prior statement? He said, I don't want to talk on tape. And that was the only talking that was going on. That's exactly what he said. And then after that, he waived his Miranda rights. Let me give you the context. After that, Dwight, I thought when he invoked, if that's an invocation of Miranda rights, the policeman was obligated to cease questioning this fellow. That's when he waived his Miranda rights, Your Honor. If I may, I can give you the context. He was interviewed by the police. Okay. Why don't you just give us your statement of what you believe the evidence to show. I think this is undisputed. He expressly waived his Miranda rights when the interview first started. He talked to the police for approximately 30 minutes, answering their questions, denying that he ever set foot in that gas station that was robbed. He then again waived his Miranda rights when the police told him that the questioning was going to be taped. When the taping began, he confirmed that he was waiving his Miranda rights. When the next question was asked, he said, no comment. He never said end of interview. He never said he would not answer any questions. He never made any effort to limit the scope of questioning. Where was the statement, I don't want to talk on tape, where was that in this? I believe there was a ‑‑ I believe he testified, the officer, the interviewing officer testified to that. I got a look in the ‑‑ Was it before the second Miranda warning or was it after the second Miranda warning? There were two Miranda warnings. Right. The first was when the interview first began, and the second Miranda warning was after he was alerted that the tape, that there would be a taping of his comments in the interview itself. After that was given, the tape was turned on, and he was asked, did you waive your Miranda rights? Yes. Or, excuse me, he said, I'll read you what the transcript says. I'm just wondering where he said I don't want to talk on tape was. That's one of his statements, right? I believe so. That was a testimony at trial, and there was nobody that disputes that. And there's nobody that disputes that he was ‑‑ Well, the question is at what point ‑‑ Advises Miranda rights on waiving. What's kind of important where it was? At what point, yeah, did he make that statement? That he does not want to talk on the tape? Yeah, was it after the second Miranda? No, it was before the second one. It was before the second one. It was after the first one and before the second one. And then so he waived his Miranda rights again? He did, Your Honor. For the second time. Let me finish my question. He waived it again for the second time after making the statement that I don't want to talk on tape? Correct. Where did he waive it? Where? What did he say to waive it? I can read it to you because it's on page 20 of the AOB. Read it. Page 20 of the AOB. AOB. Okay, just a minute. Page 20. Question. This is the office. And, Grady, prior to turning the tape on, and the tape's now on, I filled out the statement form with your name and address and so forth, and I advised you of your rights. I advised you that you have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to talk to a lawyer, and you have one present while you are being questioned. If you cannot afford a lawyer, one will be appointed. When did he give the Miranda rights? He gave the Miranda rights before the tape was turned on. Yeah, but how long? That was before the tape was turned on, and then he went on, and there was conversation not taped. Isn't that correct? I mean, I've got part of the record right here. And what the policeman says, did you tell him you were going to turn on the tape, or did you just sort of pull it out? The tape recorder, I pulled it out and told him we wanted to obtain a typed statement from him. Is that when he had a problem talking to you? Yes. What did he say? Said he didn't want to talk on tape. Right, but he was also – Was there something that I don't know that the officer said, here are your Miranda rights again? Yes, Your Honor. Well, maybe I can't find it. Where am I supposed to find it? Go to page – Is it in the briefs somewhere? They are in the briefs, Your Honor. In the briefs? In our brief and the Respondent's. Your brief, the Respondent's brief, and in the appellant's brief. All right. The appellant's brief, is that what you're referring to? I'm – yes, it's – the appellant's brief has a site – yes, the appellant's brief has a transcription of the tape. The appellant's or the appellant's? The appellant. All right. All right, what page? Page 20. But that doesn't show – that doesn't show at all when the appellant made the statement, I don't want to talk on tape, does it? No, it doesn't. And I'd have to look through the transcript. That's what we're looking for. I'd have to look through the briefs and where we have the transcript citations, and if the court wants the precise page number, I'd be happy to provide it to you. Isn't it important whether he made that statement before or after the second Miranda warning? I believe it's never been disputed. Page 20, that was the first Miranda warning as I read it because it says, testing, testing. Yeah, today is July 12th. It's about 12 noon. I'm a sergeant so-and-so, my partner's so-and-so, and Mr. Grady. And then he says – and then he said, prior to turning on the tape, I filled out the statement, so on and so forth. And you gave him the Miranda warnings apparently after he said, I don't want to talk on tape. Is that right? Yes. All right. It looks to me like what happened is he gave him his Miranda warnings, and then they had a conversation, and then somewhere, then the officer told him that he wanted to tape the rest of the interview, and he said, no, I don't want to talk on tape. Then Aguirre reread his Miranda rights and proceeded to tape the remainder of the interview. And it starts out with testing, testing. Right. And he says, you remember that I read you these, and da-da-da-da-da-da, and he said, and you remember saying you heard those rights, you remember saying having these rights in mind, do you wish to talk, and you said, yeah. So he reiterates on the first part of the tape what he did. I don't know that you would say that was a second advisement, but he says, you remember I said all that, you remember you said, yeah, yeah. And then, okay, now, Grady, we were talking to you about the attempted robbery. Then he says no comment. Correct. So you don't actually, if this is a correct transcript, you don't actually have him re-waving his rights again. You have the officer reminding him at the start of the taping, I read you all of this, and you heard all of this, and you remember you said, yeah, and you said, yeah. Correct. And then he asks him a question and he responds without. And then he says no comment. No comment without responding to the, on the basis that he has, he's asserting his Miranda rights. Isn't a no comment completely consistent with his prior statement that I won't talk on tape? If possibly so. The question is. If it is possibly so, then it is not an adoptive admission as was ruled in this case. Isn't that so? No, because if it's possibly so, it's not necessarily so. The question is whether the State court was objectively unreasonable in concluding, based on the circumstances surrounding that statement, whether he was clearly, unequivocally asserting Miranda rights, asserting his right to silence. What is the, what case you rely on as being closest to this case on the facts where, you know, the court held that there was not an unequivocal assertion of the Miranda right? What's your best case on similar facts? I don't know that there are facts that are similar. There are applications of law that are applicable, that are relevant. You might look at the First Circuit case in Bui v. DiPriolo. That's 170F3rd at page 240 or so. Again, the rule, the governing law here is that the statement by the suspect who is being interviewed by the police has to be clearly, unequivocally, and unambiguously an assertion of Miranda rights to stop the interview. Clear, unambiguous, and unequivocal. Okay, I think we have that. I think we have that in mind. Yes. But even though your time is up, I'd like you to do your best harmless error analysis for me. Okay. The harmless error analysis, I think, is very clear. Because when he was interviewed, and the evidence of that interview was properly admitted, he clearly, he repeatedly, he consistently, he strongly denied ever being at the gasoline station that was robbed. And he denied this vigorously before he learned that his fingerprints were there. At the time of trial, he brought in the co-perpetrator who had already completed his prison time, who said, no, he wasn't there. And then he was impeached because he had told the police before conviction that Arnold was one of the robbers. So the question is very simple. So he put the, did he put the guy on the stand or did the prosecution call the guy? I believe the prosecution did in order to impeach him for a prior inconsistent statement. Now, who called that, who called the co-defendant first? Called the co-defendant first. I mean, did the defendant call him as a witness or did the prosecution call him and then get him impeached? I believe the prosecution called. So you just said that he called him to show that. But I mean, I think the prosecution wanted him to say what he had told the police before. Correct. And then he backpedaled and then he got impeached with his prior statement, right? Correct. Okay. Because the Well, that's a little bit different. It is different. But I mean, that's the, it goes to the evidence, but. The evidence is that the co-defendant who admitted, or the co-perpetrator who admitted committing crime, who served sentence, who was related, I believe he was the father of the defendant. Did I leave anything out of your harmless error analysis? No, you did not, Your Honor. All right. Can I ask one question? Sure. In the trial, apparently the statements that incriminated him were oral statements. The prior statements before recording. Those did not get into the trial. Am I correct? The recording of his first, I'm sorry. No, the non-recorded statement. The policeman saying, he told me this, he told me that before I turned the tape recorder on. Did that get into evidence? Yes, Your Honor. So were those statements incriminating? Very much so, Your Honor, because they established that he was denying vigorously, ever having been in that gas station, and the jury learned that he was not stating truthfully. Oh, okay. But what happened? He was trying to get out of it in the first place. Right, because he did not know his fingerprints had been found. That's why he was denying it vigorously. Now, the response, I guess, is, well, maybe he forgot that he just happened to be at that gas station on the day it happened to be robbed, with the people who robbed it, in the car that drove the people who robbed it. Again, the jury heard all this. It was admissible. It came in properly. And to the extent that there was any error, which we denied there being, it was harmless under Brecht, which requires substantial and injurious effect by any inadmissible evidence that affected the jury's verdict. All right. Thank you. Thank you. In answer to Judge Brecht's question, the dialogue that concerned the tape recorder and continuing the questioning is in the excerpts of record on page 61. And it basically says, did he say he didn't want to talk to you at all? No. Did he at any point ask for an attorney? No. Now, notwithstanding the fact that Mr. Arnold told you he did not want to talk on tape, did you go ahead and activate the tape anyhow? Answer, yes. Question, when you activated the tape, did you go over again the admonishment and waiver of rights? Yes. Well, we're not really, okay, we're really not, the first part of the statement's in, correct? That's, we're not worried about that. It's the effect of if he was invoking, the prosecutor was allowed to get the answers in, no comment, no comment, and basically argue, you know, adoptive admission. Right. And you're claiming it was a comment on his right to remain silent. But you can't, you know, we still have to deal with the first part of it came in. Yeah, but I think that what I'm trying to do is show that. If it is error as you're arguing, then what was the effect? I'm trying to address Judge Bright's concern about this issue to put it in context, which is that you've got Grady Arnold resisting the officer's pressure to keep talking under the tape, and this is where it's found in the record. Now, I just want to just quickly address the prejudice point, and that is that on this alibi issue, because one of the things that's in the record is that there was a readback, and we don't know exactly what readbacks mean except that some juror had some concern, and the testimony that was read back was the testimony of the three alibi witnesses, Williams, Perry, and Winn, and that's found in the record on page 1148, and it's part of Exhibit I to the return. So clearly the alibi, he was not just washed away. It took some time for this jury to deliberate this, but our contention that the icing on the cake, so to speak, was the playing of the tape at the end of the or practically at the end of the prosecution's case in chief coupled with the adoptive admissions instruction. Thank you. Thank you so much for your argument. Thank you. This matter will stand submitted. All right. We'll call the last case on calendar. Mohammad Javid, Adirafi.
judges: Bright, Tashima, Callahan